Submitted October 4, 2022, reversed and remanded April 5, petition for review allowed July 20, 2023 (371 Or 308)
See later issue Oregon Reports

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# STEPHANIE ANDREA ORTIZ,
*Defendant-Appellant.*

## Josephine County Circuit Court
20CR23850; A175738

528 P3d 795

Defendant appeals from a judgment of conviction for one count of driving under the influence of intoxicants (DUII), ORS 813.010(4). On appeal, she asserts that the trial court plainly erred when it failed to strike testimony by the arresting officer that field sobriety tests (FSTs) that the officer administered to defendant were scientifically validated. Defendant asserts that the officer's testimony was scientific evidence for which the state failed to lay an adequate foundation. *Held*: By testifying that FSTs are standardized tests that are designed to measure impairment and validated through studies, the officer imbued her testimony with the persuasive authority of science. Following *State v. Reid*, 312 Or App 540, 492 P3d 728 (2021), which held that a trial court has a *sua sponte* duty to exclude clearly scientific testimony regarding FSTs when it is presented without a proper foundation, the Court of Appeals concluded that the trial court plainly erred in not excluding the testimony. That error was not harmless. The court exercised its discretion to correct the error.

Reversed and remanded.

---

Brandon S. Thueson, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Peter G. Klym, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed and remanded.

Pagán, J., dissenting.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for one count of driving under the influence of intoxicants (DUII), ORS 813.010(4). On appeal, she asserts that the trial court plainly erred when it failed to strike testimony by the arresting officer that field sobriety tests (FSTs) that the officer administered to defendant were scientifically validated and erred again when it permitted the officer to testify that defendant's performance on the FSTs was consistent with intoxication and not with sobriety. Defendant asserts that the officer's testimony was scientific evidence for which the state failed to lay an adequate foundation. For the reasons that follow, we reverse and remand.

In reviewing a trial court's evidentiary ruling, "we do so in light of the record that was before the court at the time of the ruling." *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019). When evaluating whether the erroneous admission of evidence was harmless, we consider all pertinent parts of the record. *Id.* A complete recitation of those facts would not benefit the bench, the bar, the public, or the parties, and thus we provide only a general recitation below.

At trial, the state presented evidence that a concerned citizen called 9-1-1 to report that she had just heard a vehicle "screech" to a stop, prompting her to look out the window and observe a white SUV in her neighbor's driveway "at an odd angle." Because of the orientation of the vehicle, the witness believed it had been traveling in the wrong lane of traffic before entering the driveway. The witness provided a detailed description of the driver.

Officer Miguel arrived at the location and approached defendant, who matched the description of the driver given by the witness. In speaking to defendant, Miguel "could smell the odor of an alcoholic beverage coming from her breath" and noticed that defendant had "watery eyes." Defendant also "had cyclical mood cycles [and] would range from being angry to crying to laughing." Defendant told Miguel that she was "a little bit tipsy," that "she did not believe that she was safe to drive," and that she had had "five beers" over the course of six to seven hours. She denied driving the vehicle.

Miguel proceeded to investigate defendant for DUII and asked her to perform two FSTs: a "walk-and-turn" test and a "one-leg-stand" test. After noting several "clues" from defendant's performance on the FSTs, Miguel arrested defendant for DUII.

Miguel testified at trial, without objection, that the FSTs are "designed to determine impairment," nationally "standardized," and supported by studies "prov[ing] their validity." Miguel then described the tests in detail, including the instructions she gave to defendant regarding the tests and defendant's subsequent performance on the tests. Miguel testified that defendant "showed five out of eight clues" on the walk-and-turn test and "three of four" possible clues on the one-leg-stand test.

Miguel's bodycam footage, which showed her interview of defendant and defendant's performance on the FSTs, was admitted into evidence and played for the jury. The jury was also presented with evidence that defendant submitted to a breath test, which measured her blood alcohol content (BAC) at .07 percent just over one hour after the officer initially received the concerned citizen's call.

In her defense, defendant testified that her husband, rather than she, had been driving. Defendant admitted that she had been drinking and that she had told Miguel that she had not felt safe to drive. Defense counsel argued in closing, however, that, based on all of the evidence, the jurors could find defendant not guilty either because they found that she had not been driving, or, if they found she had been driving, because they concluded that she had not been under the influence of intoxicating liquor "to the extent that she could not safely operate that vehicle." Among other arguments, defense counsel argued that defendant's poor performance on the FSTs could have been caused by defendant's emotional state or embarrassment rather than intoxication.

The jury returned a unanimous guilty verdict. Defendant was convicted of driving under the influence of intoxicants, ORS 813.010(4), and this timely appeal followed. We review for legal error whether evidence is "scientific," and, if so, whether it is admissible. *State v. Ohotto*, 261 Or App 70, 71, 323 P3d 306 (2014).

We begin by considering defendant's argument that the trial court plainly erred in not excluding Miguel's testimony that the FSTs administered to defendant were scientifically validated, and because we conclude that the court plainly erred in that regard and that exercising our discretion to correct the error is appropriate, we do not reach defendant's other assignment of error.

We agree with the parties that defendant's assignment of error was unpreserved and thus turn to our established plain-error inquiry. Plain-error review involves a two-step inquiry in which we first determine whether the error is plain, and second, whether to exercise our discretion to consider the error. ORAP 5.45; *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). To constitute plain error, the error must be (1) one of law, (2) obvious, *i.e.*, not reasonably in dispute, and (3) "apparent on the record without requiring the court to choose among competing inferences." *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013).

As the court explained in *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995), "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate." (Footnote omitted.) Hence, "in the absence of a clear case, a case for judicial notice, or a case of *prima facie* legislative recognition," *id.* at 293 (footnote omitted), the trial court must assess the scientific validity of proffered scientific evidence by considering the potential factors outlined in *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984), and *O'Key*, 321 Or at 299-306. The proponent of the evidence must lay an adequate foundation addressing the *Brown/O'Key* factors. *State v. Trujillo*, 271 Or App 785, 791, 353 P3d 609, *rev den*, 358 Or 146 (2015).

Because the state did not lay such a foundation here, the questions before us are whether Miguel's testimony constituted "scientific" evidence and whether the trial court plainly erred in not *sua sponte* excluding it as such. We have previously stated that "[e]vidence qualifies as scientific when it is expressly presented to the jury as scientific, when it draws its convincing force from scientific principles,

or when it would likely be perceived by the jury as imbued with the persuasive appeal of science." *State v. Reid*, 312 Or App 540, 543, 492 P3d 728 (2021) (internal quotation marks omitted).

We readily conclude that Miguel's testimony was scientific evidence. In *Eatinger*, we determined that an officer's testimony that FSTs are scientifically validated and "the product of scientific research" was scientific, "because it purported to draw its convincing force from principles of science" rather than the officer's training and experience. 298 Or App at 631, 642. Similarly in *State v. Beltran-Chavez*, 286 Or App 590, 614, 400 P3d 927 (2017), we determined that an officer's testimony that the defendant "passed" or "failed" the walk-and-turn and one-leg-stand FSTs was scientific evidence, because "the proposition underlying that testimony is that the test is able to measure impairment objectively and that a specific numerical score can prove that the subject is impaired."

Here, Miguel testified that the FSTs were "designed to determine impairment," nationally "standardized," and, perhaps most concerning, supported by studies "prov[ing] their validity." That testimony is functionally indistinguishable from the evidence considered in *Eatinger* and *Beltran-Chavez*. We thus reject the state's contention that the evidence at issue was not "plainly scientific." Because the state did not attempt to lay an adequate *Brown/O'Key* foundation, it would be error for a trial court to admit the above testimony over an appropriate objection.

We appreciate the dissent's position that Miguel's testimony that the FSTs were "designed to determine impairment" may not, standing alone, constitute scientific testimony. 325 Or App at 148 (Pagán, J., dissenting). It is difficult to understand that testimony as meaningfully different than an officer's testimony that FSTs can be "passed" or "failed," which we concluded was scientific testimony in both *Beltran-Chavez* and, as discussed further below, *Reid*. *See Beltran-Chavez*, 286 Or App at 614; *Reid*, 312 Or App at 543. But we need not decide this case on those words alone. As noted, in addition to testifying that the FSTs were "designed to determine impairment," the officer also testified

that the tests were nationally "standardized" and that they were supported by studies "prov[ing] their validity." That is testimony that derives its force from scientific principles—it presents a jury with the contention that a national standard has not only been developed, but that studies have determined that the tests produce scientifically valid evidence of impairment. All of that testimony together presented the jury with the impression that the FSTs were derived from, proved by, or, at a minimum, imbued with the persuasive appeal of science.[1]

As noted, defendant did not object to Miguel's testimony. We therefore turn to whether it was plain error for the trial court to not recognize the testimony as obviously scientific testimony lacking a foundation and, accordingly, *sua sponte* exclude its admission into evidence.

Based on our recent decision in *Reid*, we conclude that that error was plain and that the trial court had a duty to exclude the evidence. In *Reid*, an officer testified that the FSTs are "pass or fail" tests. 312 Or App at 543. The defendant did not object to that testimony. *Id.* On appeal, the state conceded "that plain-error review and reversal would be appropriate." *Id.* at 541. We accepted the state's concession. *Id.* Although our plain-error analysis was not extensive, we highlighted that the officer's pass/fail testimony was nearly identical to the testimony in *Beltran-Chavez*. We then concluded, based on *Beltran-Chavez*, that it was "obvious [and] not reasonably in dispute" that it was legal error to admit that scientific testimony without a proper foundation. *Id.* at 543-44.

The necessary implication from *Reid* is that a trial court has a *sua sponte* duty to exclude clearly scientific testimony regarding FSTs when it is presented without a proper foundation. As discussed above, the testimony at issue here, which included testimony that the FSTs were supported by studies proving their validity, was similarly—if not more obviously—scientific testimony than that at issue in *Reid*.

---

[1] Of course, jurors may be presented with scientific evidence. As we note above, however, due to the inherently persuasive appeal of evidence that is perceived by jurors as scientific, the court must first assess the scientific validity of such evidence before permitting its admission. *O'Key*, 321 Or at 291-92.

By testifying that FSTs are standardized tests that are designed to measure impairment and validated through studies, Miguel imbued her testimony with the persuasive authority of science.

The dissent contends that we are creating new law through this decision and questions why we would create a new *sua sponte* duty for trial courts to strike such testimony.[2] 325 Or App at 151-53 (Pagán, J., dissenting). Respectfully, our decision is controlled by *Reid*, which held that it was plain error for a trial court to admit scientific testimony that FSTs are pass or fail tests, even when, as in all plain error cases, the party opposing admission did not object. By concluding that there was plain error in those circumstances, *Reid* necessarily requires trial courts to strike such testimony.

Further, as we did in *Reid*, we also exercise our discretion to correct the error. *Id.* at 544 (stating that "we perceive no reasons why our exercise of discretion to correct the error is not appropriate"). We first note that we do not agree with the state's contention that there is little likelihood that Miguel's erroneously admitted testimony affected the verdict.[3] *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (describing harmless-error inquiry). Here, defendant's BAC was under the *per se* limit when tested approximately one hour after the initial call to the police. The state needed to prove that defendant drove while her "physical or mental faculties were adversely affected to a noticeable or perceptible degree." *State v. Miller*, 265 Or App 442, 445, 335 P3d 355 (2014). Thus, the state needed to prove both that defendant had been the driver of the vehicle and that she

---

[2] Although we respectfully disagree with the dissent on the merits, we appreciate that it may be appropriate to probe whether a trial court should have a *sua sponte* duty to strike clearly scientific testimony. There are arguments pointing in each direction. Our decision in *Reid* did not directly confront those arguments. It may be that the Supreme Court ultimately addresses the issue. In the meantime, however, *Reid* constitutes controlling case law for our court, and in the absence of argument from the parties that *Reid* was wrongly decided, the principles of *stare decisis* require that we follow that controlling law.

[3] The state contends that any error was harmless, and that we should affirm on that basis. The state also separately contends that, because any error was harmless, we should not exercise our discretion correct it. As discussed below, we reject both contentions.

had been adversely affected while doing so. Defendant contested both elements at trial. And, although the state is correct that other evidence in the record could have supported a jury finding that defendant was impaired at the time of the incident—including, notably, defendant's own admission that she did not believe she was safe to drive—that alone is insufficient to render the court's error harmless. As in *Eatinger*, Miguel's testimony that the FSTs were scientifically validated "presented the jury with evidence that had persuasive value apart from [other evidence] that defendant was impaired." 298 Or App at 646. And, as we concluded in *Beltran-Chavez*, Miguel's testimony "presented the jury with a separate, ostensibly *objective*, reason to believe that defendant was under the influence." 286 Or App at 618 (emphasis added). We further observe that the state emphasized and relied on the FST results in its closing argument. That emphasis leaves us unable to conclude that the testimony bore "no relationship to the jury's determination of its verdict" or was "duplicative or unhelpful to its deliberations." *Davis*, 336 Or at 32-33.

The dissent notes some of the additional persuasive evidence that may have nevertheless caused the jury to convict in this case, and suggests that, even assuming there was error, any is harmless. 325 Or App at 150-51 (Pagán, J., dissenting). But our job is not to reweigh the evidence or decide whether that other evidence was substantial when balanced against the improperly admitted evidence. We have rejected similar arguments in the past:

> "[T]he state's request, which calls for us to consider the 'overwhelming' evidence of guilt and balance it against the probative value and credibility of defendant's proffered testimony, invites us to reweigh the evidence. That is not our task when we conduct a harmless-error analysis. In conducting that analysis, we focus on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

*State v. Zaldana-Mendoza*, 299 Or App 590, 613, 450 P3d 983 (2019) (internal quotation marks omitted). We focus here on whether the improperly admitted scientific evidence had little likelihood of affecting the verdict. As noted above,

due to the inherently persuasive effect of scientific evidence and the prosecution's focus on the FST results in its closing argument, we cannot say that the testimony at issue had little likelihood of affecting the verdict.[4]

Finally, we are not persuaded that exercising our discretion in this case is inappropriate because of defendant's failure to object to Miguel's scientific testimony. Although the state posits that it could have laid an adequate foundation had defense counsel appropriately objected, we are not so sure—Miguel was a police officer who did not testify to possessing any special scientific knowledge and who referenced her police academy training, "wet lab" experience, and prior DUII investigations when asked to detail her training regarding FSTs. Thus, it is difficult to see how the state could have laid an adequate *Brown/O'Key* foundation for Miguel to testify as a scientific expert had defense counsel objected to the evidence. *Cf. State v. Garcia*, 320 Or App 123, 138, 512 P3d 839, *rev den*, 370 Or 602 (2022) ("[n]othing suggests that, if defendant had objected, the state would have been unable to successfully address the objection and secure admission of the same testimony").

In conclusion, the trial court plainly erred in not excluding Miguel's testimony that the FSTs were "designed to determine impairment," nationally "standardized," and supported by studies "prov[ing] their validity." That error was not harmless. We also exercise our discretion to correct that error. Because we reverse and remand for a new trial, we need not address defendant's contention that the trial court also erred in permitting Miguel to testify that defendant's performance on the FSTs was consistent with other indicators of impairment and inconsistent with how a sober person would perform. However, because the issue could occur again on remand, we reiterate, as we have said in other cases, that an officer may testify to their opinion regarding a defendant's intoxication without establishing a

---

[4] We also note that we see this as a closer case than the dissent. Of course, the jury heard significant evidence that could lead it to conclude that defendant drove while impaired. But, as noted, the jury also heard evidence that defendant's breath test indicated a .07 percent BAC. That is below the *per se* legal limit for DUII, ORS 813.010(1)(a), and the video evidence of defendant's impairment is also not overwhelming.

scientific foundation, even if that opinion is in part based on scientific evidence, if the opinion "draws its force from [the officer's] training and experience" and "does not imply that it is based on science." *Beltran-Chavez*, 286 Or App at 603-04; *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013).

Reversed and remanded.

**PAGÁN, J,** dissenting.

"Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Estelle v. Williams*, 425 US 501, 512, 96 S Ct 1691, 48 L Ed 126 (1976). When an appellate court exercises its discretion to correct plain error regarding testimony or evidence, it communicates to trial judges that they should be ready to intervene *sua sponte* on a regular basis during trials, regardless of the potential tactical decisions the parties have made for themselves. While there may be circumstances that warrant such a transformation from jurist to advocate—such as unequivocal vouching—it behooves us to restrict the expansion of such a doctrine beyond what is absolutely necessary to ensure that litigants enjoy fair trials. I dissent from the majority because I disagree that any error occurred below, and if there was error, it was harmless. But I also dissent to the extent the majority is comfortable with expanding the doctrine of requiring *sua sponte* striking of testimony beyond unequivocal vouching.

Relying on the plain-error doctrine, the majority reverses defendant's conviction, after a jury trial, for driving while under the influence of intoxicants (DUII), ORS 813.010(4). But the error was not plain, and we should not exercise our discretion to consider it. By doing so, the majority creates a new rule for trial judges, imposing a new *sua sponte* duty to strike testimony about the purpose of field sobriety tests (FSTs), whether they are nationally standardized, and why police officers use them, despite allowing officers to then testify about the tests and how the officers utilized them. That new rule is confusing, inherently

contradictory, exceedingly difficult to enforce, and I disagree with the majority's suggestion that our prior cases compel us to adopt it. In addition, the claimed error, if any, was harmless.

The state charged defendant with the misdemeanor offense of DUII, ORS 813.010(4). At defendant's jury trial, the state called two witnesses: the person who made a 9-1-1 call, and the police officer who responded. The first witness testified that she made the call because she heard a vehicle screech to a halt, and the witness saw a man pull a woman out of the driver's side of the vehicle.

Officer Miguel, a police officer with the City of Grants Pass, responded to the 9-1-1 call. Miguel located "a male, female and juvenile matching the exact description provided" by the witness who made the 9-1-1 call. Miguel made an in-court identification of defendant as the woman with whom she spoke. Miguel was initially investigating the incident as one of domestic violence. But when Miguel learned that defendant may have been driving, Miguel "continued forward with a DUI investigation."

Miguel "could smell the odor of an alcoholic beverage" coming from defendant's breath, and defendant had "watery eyes." Miguel testified regarding other "indicators of impairment," including that defendant "was emotional, she had cyclical mood cycles *** rang[ing] from being angry to crying to laughing, [and] she was quickly annoyed with certain questions." Miguel testified that defendant "had even offered to me that she was feeling a little bit tipsy." Defendant told Miguel that she did not believe that she was safe to drive. Defendant said that she drank five beers that day. When asked by the officer to rate her intoxication on a scale of one to 10, with one being completely sober, and 10 being falling down drunk, defendant rated herself as a four. Defendant told the officer that "she was not wearing underwear because she had previously urinated herself during the day."

Regarding FSTs, the prosecutor asked the officer whether she had "received any specific training in administering" them. Miguel responded that she had. The prosecutor asked for an explanation of "the purposes" of FSTs.

Miguel responded, "They are divided attention tests. They are designed to determine impairment." Miguel required defendant to perform "the walk-and-turn test and the one-leg stand." When asked whether "those tests [are] used by law enforcement around the country," Miguel responded, "Yes. Those are standardized tests." The prosecutor asked, "Why are those tests used around the country?" Miguel responded, "Like I said, they are standardized. There have been studies conducted to prove their validity. There—it's a national standard, so it's not just something that I made up or anybody in my department made up. It is a national standardized test. It is conducted the same way, it has the same set of instructions, same set of rules for each person that performs that nationwide."

Regarding her training, Miguel explained that, in the basic academy, she took a course called, "Standardized Field Sobriety Tests." Miguel participated in a "wet lab," which involved performing the tests on volunteers who had been drinking. Miguel passed the training, and she had experience conducting several DUII investigations for drugs and alcohol.

Miguel described the walk-and-turn test, and when defendant performed the test, Miguel observed "five out of eight clues" of impairment. Shortly thereafter the following exchange occurred:

"Q   And you had already said, but let's go over it again—how many clues did the Defendant display?

"A   Five out of eight.

"Q   Was that consistent with her statements that she was unsafe to drive?

"A   Yes.

"Q   Was that consistent with the odor of alcohol you smelled?

"A   Yes.

"Q   Was that consistent with her watery eyes?

"A   Yes.

"Q   Was that consistent with her mood swings?

"A   Yes.

"Q   Was that consistent with the erratic driving you learned about?

"A   Yes.

"Q   Please compare for the jury what you observed the Defendant do with what you would expect a sober person to do.

"A   The test, as it's explained—

"[DEFENSE COUNSEL]:   Your Honor, I'm going to object as to foundation and speculation. I don't think that—

"[PROSECUTOR]:   It's (indiscernible) training and experience and the opinion she formed in the course of her duties.

"THE COURT:   Yeah. Overruled.

"THE WITNESS:   I can explain? Can you say the question one more time?

"Q   Please compare for the jury what you observed the Defendant do with what you would expect a sober person to do.

"A   So, I would expect a sober person who has never seen those tests before, never performed them in their life, I would definitely not expect them to demonstrate five out of eight clues. These tests are not difficult. They are very basic. I give the instructions very clearly. I repeat multiple key points of the instructions, multiple times. So, if there's—I give the person [an] opportunity to ask questions. I confirm with them that they understand the test before they begin it. So, if they have any questions about what they saw or what I demonstrated, or if they weren't listening, got distracted by something, they have the opportunity right there to ask me before they perform the test. So, there shouldn't really be a reason why there's that many indicators of impairment if you're completely sober."

Next, the officer described the one-leg stand test and her training and experience administering it. On that test, defendant exhibited three out of four clues. After performing the two tests, Miguel placed defendant under arrest. The jury watched excerpts from the body camera footage of Miguel's encounter with defendant, including

video of defendant's performance on the two FSTs. On the video, when asked whether she thought she was safe to drive, defendant responded, "Not right now. Fuck no."

Defendant testified at her trial. She explained that she drank some beers at an Easter party at her sister's house. Defendant denied driving the vehicle after drinking alcohol that day. Defendant stated that her husband drove the vehicle. After closing arguments and jury instructions, the jury returned a verdict of guilty on the charge of DUII. Defendant appeals.

On appeal, defendant raises two assignments of error. First, she argues that the trial court improperly admitted the officer's testimony that "five out of eight clues on the walk-and-turn test was consistent with being unsafe to drive, driving erratically, exhibiting mood swings, having an odor of alcohol and watery eyes, and was inconsistent with being sober." Second, defendant argues that the trial court improperly admitted the officer's testimony that "the FSTs were scientifically validated."

The majority focuses on the second assignment of error. 325 Or App at 137. Defense counsel did not object to Miguel's testimony that FSTs are "designed to determine impairment," nationally "standardized," and that "[t]here have been studies conducted to prove their validity." As a result, the majority conducts a plain-error review. *Id.* Relying on *State v. Eatinger*, 298 Or App 630, 448 P3d 636 (2019), and *State v. Beltran-Chavez*, 286 Or App 590, 400 P3d 927 (2017), the majority determines that Miguel's testimony was scientific evidence. 325 Or App at 138. Then, relying on *State v. Reid*, 312 Or App 540, 492 P3d 728 (2021), the majority concludes that the trial court had a duty to *sua sponte* exclude the testimony. 325 Or App at 139-40.

I respectfully disagree. "For an error to be plain error, it must be an error of law, obvious and not reasonably in dispute, and apparent on the record without requiring the court to choose among competing inferences." *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). Here, it is not obvious that the officer's statements about FSTs were scientific, and it is reasonable to dispute that contention. In *Eatinger*, 298 Or App at 642, we concluded that an officer's

statements were scientific evidence because he "*expressly* testified as to the scientific validation of the clues he had observed \* \* \*; he also expressly adopted the prosecutor's statement that the FSTs were the product of scientific research." (Emphasis in original; internal quotation marks omitted.)

But here, the testimony is less clear. Miguel's statement that FSTs are "designed to determine impairment" does not appear to be scientific at all, and it is reasonable to construe it as a straightforward description of the purpose of FSTs. Miguel testified regarding the walk-and-turn test and the one-leg-stand test. In *State v. O'Key*, 321 Or 285, 297, 899 P2d 663 (1995), the Supreme Court indicated that testimony regarding those two tests is not scientific because, unlike the horizontal gaze nystagmus test, they "obtain their legitimacy from effects of intoxication based on propositions of common knowledge."

Admittedly, the officer's statements that those two tests are nationally "standardized" and that "[t]here have been studies conducted to prove their validity" come closer to crossing the line between expert testimony based on training and experience and expert testimony that is scientific. But it is not obvious or beyond reasonable dispute that they do so. In *Beltran-Chavez*, 286 Or App at 616, we held that testimony that the defendant "passed" or "failed" the FSTs was scientific evidence that was inadmissible absent a sufficient foundation. "When an officer testifies that a defendant 'failed' the walk-and-turn test or the one-leg-stand test, that testimony relies on an external scoring rubric to prove that the defendant was objectively, measurably impaired. Indeed, the state acknowledged as much by arguing, in response to defendant's pretrial motion, that FSTs are standardized tests." *Id.* at 611. Similarly, in *Reid*, 312 Or App at 543, the officer's testimony was objectionable because the officer described the end result of the test as a pass or fail.

But here, unlike in *Beltran-Chavez* or *Reid*, the officer did not testify that defendant failed the two FSTs. Miguel did refer to the tests as nationally "standardized," but, by itself, it is not clear that statement is scientific. Miguel's use of the word "standardized" was likely something she learned

in her training because she stated that her training course was called "Standardized Field Sobriety Tests." Miguel also explained that "it's a national standard, so it's not just something that I made up or anybody in my department made up. It is a national standardized test. It is conducted the same way, it has the same set of instructions, same set of rules for each person that performs that nationwide." So understood, "standardized" does not necessarily imply that the test is grounded in principles of science; instead, it could be understood to mean that the officer was trained to use a test for impairment that is the same test used by law enforcement throughout the United States. *See Eatinger*, 298 Or App at 636 (referring to the "NHTSA's 'standardized field sobriety test curriculum'").

Miguel's reference to studies conducted to prove the validity of FSTs comes closer to expert testimony based on science, but, unlike the officer in *Eatinger*, Miguel did not refer to FSTs as "scientifically validated" or as "the product of scientific research." 298 Or App at 642. Thus, it is less clear that the jury would have viewed Miguel's testimony as drawing "its convincing force from some principle of science, mathematics and the like." *Id.* at 640 (quotation marks omitted). The key point here is that "the line between expert testimony based on training and experience and expert testimony that is scientific can often be difficult to draw." *Id.* at 641. The instant case is a good example of that difficulty. Because the error is not obvious, it is not plain. *See State v. Serrano*, 355 Or 172, 182, 324 P3d 1274 (2014), *cert den*, 576 US 1037 (2015) (rejecting plain-error argument because "defendant has not demonstrated the obviousness of the posited unpreserved error").

Even if the error was plain, we should not exercise our discretion to consider it. A decision to consider plain error should be made with the "utmost caution" because it undercuts the policies served by the preservation doctrine and OEC 103(1)(a). *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991). "It is only in rare and exceptional cases that this court will notice an alleged error where no ruling has been sought from the trial judge." *State v. Gornick*, 340 Or 160, 166, 130 P3d 780 (2006) (internal quotation marks omitted). The determination of whether to

exercise our discretion to address a plain error involves the consideration of a variety of factors, including "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error." *Ailes*, 312 Or at 382 n 6.

The majority concludes that there was a plain error and it exercises its discretion to consider the error because it was not harmless. 325 Or App at 139-40. According to the majority, "Miguel's testimony that the FSTs were scientifically validated 'presented the jury with evidence that had persuasive value apart from [other evidence] that defendant was impaired.'" *Id.* at 140-41.

Respectfully, the majority downplays the significant evidence of defendant's impairment. Miguel "could smell the odor of an alcoholic beverage" coming from defendant's breath, and defendant had "watery eyes." Defendant was emotional and had "cyclical mood cycles." Defendant told Miguel that she was feeling a little bit tipsy, and she did not believe that she was safe to drive. The jury watched video from Miguel's body camera, and, when Miguel asked defendant whether she thought she was safe to drive, she responded, "Not right now. Fuck no." Defendant had five beers that day. When asked to rate her intoxication on a scale of one to 10, defendant rated herself as a four. Defendant told the officer that "she was not wearing underwear because she had previously urinated herself during the day." The jury watched video of defendant's performance on the walk-and-turn test and the one-leg-stand test. Having done so, the jurors could assess for themselves whether defendant exhibited signs of impairment.

Granted, "scientific evidence has manifest potential to influence a jury," *Eatinger*, 298 Or App at 646, but here, it is not clear that the jury would have viewed Miguel's challenged statements as scientific. The nature of the FSTs was not a central issue and, when compared to the ample

evidence of impairment, there is little likelihood that the jury's verdict was affected by Miguel's reference to FSTs as "standardized" tests or by her statement regarding studies that prove their validity. *Cf. Beltran-Chavez*, 286 Or App at 618 (The erroneous admission of testimony that the defendant failed the walk-and-turn test was not harmless because the other evidence that defendant was under the influence of alcohol "was not overwhelming."). The unpreserved error, if any, was harmless, so we should not exercise our discretion to consider it. *See State v. Kerne*, 289 Or App 345, 349, 410 P3d 369 (2017), *rev den*, 363 Or 119 (2018) ("One circumstance in which we will not and cannot exercise our discretion to correct a plain error is when the error is harmless, that is, when there is little likelihood that the error affected the jury's verdict.").

There is another, perhaps more important, reason why we should not exercise our discretion to engage in plain-error review. By doing so, the majority creates a new rule requiring trial judges to *sua sponte* strike testimony regarding FSTs that may or may not be scientific.[1] For the majority, that new rule arises as a "necessary implication from *Reid*." 325 Or App at 139-40. But in *Reid*, relying on *Beltran-Chavez*, we determined that it was plain error for an officer to testify regarding passing or failing an FST, a point conceded by the state. *Reid*, 312 Or App at 543-44. In *Reid*, we made no statement concerning whether it was plain error for the trial court to fail to *sua sponte* exclude the testimony. If such a duty arises as a necessary implication from *Reid*, then we should be especially careful not to invoke

---

[1] Other state courts are more cautious about requiring a judge to intervene beyond unequivocal vouching. *See, e.g.*, *State v. Hanes*, 171 NH 173, 182, 192 A3d 952, 959 (2018) ("We have never held that a trial court must *sua sponte* strike or issue a curative instruction with respect to witness testimony and, in fact, we have suggested that courts should refrain from taking such action." (Underscoring in original; internal quotation marks omitted.)); *Com v. Pimental*, 54 Mass App Ct 325, 330, 764 NE 2d 940 (2002) ("[T]he trial judge's responsibility to conduct a fair trial does not require her to act as an attorney for a pro se litigant. Certainly, a defendant represented by counsel is entitled to no greater process."); *State v. Wragg*, 61 Conn App 394, 399, 764 A2d 216, 220 (2001) ("When subsequent events reveal that [counsel's strategic choice not to object] *** was an imprudent choice, however, the defendant is not entitled to turn the clock back and have [the appellate court] reverse the judgment because the trial court did not, sua sponte, strike the testimony and give the jury a cautionary instruction." (Internal quotation marks omitted.)).

the plain-error doctrine when the claimed evidentiary error is a close call and not obvious.

There is a significant difference between the question of whether testimony is inadmissible and whether a trial judge plainly errs by failing to *sua sponte* exclude or strike the testimony. *See State v. Corkill*, 262 Or App 543, 551, 325 P3d 796, *rev den*, 355 Or 751 (2014) ("[T]he question before us *** is not whether the prosecutor's cross-examination of defendant was objectionable. Rather, the pertinent question is whether the trial court plainly erred by not interrupting the prosecutor's cross-examination of defendant *sua sponte*."). The very act of *sua sponte* intervening to either strike testimony or give a curative instruction is wrought with peril. As one federal judge has cogently explained regarding the practical effects of requiring judges to *sua sponte* intervene during trial:

> "A conclusion that the admission of certain evidence constitutes plain error is a determination that the evidence was so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte,* should have excluded the evidence. Thus, the existence of plain error review forces the district court, in an effort to avoid the reversal of conviction and a retrial, to intervene and exclude the evidence on its own initiative. In determining whether to do so, the district court must either ignore the possibility that defense counsel is choosing not to object for strategic reasons (and therefore intervene in every instance) or must weigh that possibility against the potential time and cost of a retrial (assuming one is even possible under the circumstances). To the extent the district court even attempts the latter analysis, however, it does so at a specific moment during the course of the trial without the benefit of the entire record (in particular, what other evidence the prosecution is prepared to offer, and what use the prosecution or defense intends to make of the evidence). Because it is extraordinarily difficult, if not impossible, to determine, mid-trial, whether the admission of a certain piece of excludable evidence prejudices a defendant's substantial rights, the possibility of a retrial creates an incentive for the district court *always* to intervene. This result essentially deprives defense counsel of the ability to determine strategically a client's most effective defense—a consequence I would prefer to avoid."

*United States v. Smith*, 459 F3d 1276, 1300-01 (11th Cir 2006) (Tjoflat, J., concurring) (emphasis in original; footnote omitted).

　　　　When a witness, expert or otherwise, is asked to comment upon the credibility of another witness, the Supreme Court has instructed trial judges to *sua sponte* "cut off the inquiry before a jury is contaminated by it." *State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988); *see B.A. v. Webb*, 253 Or App 1, 12, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) ("It is legally impermissible under Oregon law for a witness to comment on the credibility of another witness, and, in enforcing that principle, trial courts are obligated, *sua sponte*, to exclude and, if necessary, strike testimony that comments on a witness's credibility."); *see also State v. Chandler*, 360 Or 323, 330-31, 380 P3d 932 (2016) (discussing history of the "judicially created rule" against vouching). Such evidence is so obviously contrary to the fundamental structure of our adversarial system that *sua sponte* intervention is rightfully considered a part of the basic functions of a trial judge. *See Davis v. Cain*, 304 Or App 356, 363, 467 P3d 816 (2020) ("Because credibility determinations are the exclusive province of the jury, witnesses are categorically prohibited from expressing a view on whether another witness is 'telling the truth.'" (Quoting *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983).)). Now the majority imposes a similar duty on trial judges whenever it appears that a police officer may be about to testify regarding the purpose of FSTs, that they are "standardized" tests, or why law enforcement uses them. The basic, weighty concerns of vouching and the functions of a jury are not at play here, so we should not create a new rule requiring a *sua sponte* intervention.

　　　　Indeed, even in vouching cases, we tend to apply the rule sparingly. *See Davis*, 304 Or App at 368 ("[A]t least with respect to 'true' vouching, a trial court may commit plain error if it fails to *sua sponte* address vouching by a witness," but, "[t]o date, we have not reversed a conviction on direct appeal on the basis that a trial court plainly erred in failing, *sua sponte*, to address vouching by a prosecutor."). In vouching cases, "if a witness's testimony was ambiguous—such that the witness may or may not have been vouching—there

is no plain error in not having stricken the testimony *sua sponte*, in part because the lack of objection prevented clarification of the testimony." *State v. Murphy*, 319 Or App 330, 335, 510 P3d 269 (2022). In addition, even if there was unambiguous vouching that a trial court failed to strike *sua sponte*, we have declined to exercise our discretion to correct the error if it was not grave and had little likelihood of affecting the outcome. *Id.* at 338-40. Here, for the reasons explained above, the officer's challenged testimony may or may not have been scientific, but it was not clearly so. As a result, there was no plain error when the trial judge failed to *sua sponte* intervene. In addition, even if the officer's brief statements about why FSTs are used could be construed as scientific, we should not exercise our discretion to consider the error because there is little likelihood that the officer's statements affected the jury's verdict.

In vouching cases, we also consider "whether there is a plausible tactical reason why defense counsel forewent a motion to strike." *State v. Ramirez-Estrada*, 260 Or App 312, 320, 317 P3d 322 (2013), *rev den*, 355 Or 317 (2014). Here, there is a plausible reason. Although defense counsel argued that the state could not meet its burden to show that defendant was impaired, defense counsel's other theory of the case was that the state could not prove beyond a reasonable doubt that she drove the vehicle. Before trial, defense counsel objected to any testimony from the witness who made the 9-1-1 call that would involve that witness making an in-court identification of defendant as the person who drove the vehicle. The state agreed that only the police officer, who did not see defendant driving, would make an in-court identification of defendant.

In his opening statement, defense counsel argued that the "two basic issues" in the case were whether defendant was driving and whether she was under the influence of alcohol to an extent that she could not operate a vehicle safely. He argued that "there is not one witness who is going to be able to identify [defendant] as driving the vehicle." Defense counsel pointed out that the police were initially responding to a report of domestic violence or harassment, but "they quickly put that aside and figured, you know, let's

go after [defendant] for driving with alcohol, despite not having enough evidence that she was even driving the vehicle at all."

Based on that theory of the case, it is plausible that defense counsel did not want to draw more attention to the officer's testimony regarding FSTs, their purposes, whether they are nationally standardized, or their validity. Had counsel objected, there was a risk that the state would either establish the foundation with further testimony by Miguel, or, potentially more damaging, provide another witness that could buttress the officer's testimony with scientific underpinnings and foundation. In vouching cases, when there is a plausible explanation for defense counsel's failure to object, then it is not plain error for a trial court to fail to intervene *sua sponte*. *See State v. Vage*, 278 Or App 771, 777, 379 P3d 645, *rev den*, 360 Or 697 (2016) ("It is well established that an error does not qualify as plain error if the record contains a competing inference that the party may have had a strategic purpose for not objecting, and that competing inference is plausible." (Internal quotation marks omitted.)). The same reasoning applies here. We should not engage in plain-error review of defendant's second assignment of error.

I briefly address the first assignment of error. Defendant assigns error to the trial court's ruling permitting Miguel to compare defendant's performance on the walk-and-turn test to what Miguel would expect from a sober person. The trial court did not err by admitting the testimony. "[C]ertain officers may be practical experts in recognizing intoxication, and, when they are, they may offer expert opinions on that topic without first showing that the process by which they arrived at their opinions is scientifically valid, provided that their testimony does not imply that it is based on science." *Beltran-Chavez*, 286 Or App at 604. "Specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science." *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 447 (2013). Here, Miguel testified regarding her training and experience administering the walk-and-turn test. That testimony was sufficient to qualify Miguel to offer

an opinion comparing defendant's performance on the test to what she would expect from a sober person. Accordingly, I would affirm the judgment of conviction.

Respectfully, I dissent.